UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 NOV -4  A 10: 02

US DISTRICT COURT
BRIDGEPORT CT

| | |
|---|---|
| WOODMAN DESIGN GROUP, INC. )<br><br>Plaintiff, )<br><br>V. )<br><br>THE HOMESTEADS OF NEWTOWN, LLC., )<br>MORTON SILBERSTEIN, )<br>LINDA SILBERSTEIN, and )<br>ARBOR COMMERCIAL MORTGAGE LLC )<br><br>Defendants )<br><br>────────────────────────────── ) | Civil Action No. 3:01<br>CV-2029 (SRU)<br><br><br><br><br><br><br><br><br><br><br><br>November 3, 2003 |

**PLAINTIFF WOODMAN DESIGN GROUP, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO ARBOR COMMERCIAL MORTGAGE LLC'S
MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Woodman Design Group, Inc. ("Woodman") opposes Arbor Commercial

Mortgage, LLC's ("Arbor") Motion for Summary Judgment because there are material

issues of fact with respect to all of the claims asserted by Woodman against Arbor.

## FACTUAL BACKGROUND

### *The Furniture and Furnishings Provided by Woodman to Newtown Homesteads*

Woodman specializes in interior design services to businesses in the healthcare

industry. These services include not only the preparation of overall design concepts, but

also the recommendation, selection, purchase, and installation of furniture and

furnishings. *Paragraph 1 of Plaintiff Woodman Design Group, Inc.'s Local Rule 56(a)(2) Statement, Section II Woodman's Statement of Facts, Including Disputed Issues of Fact (hereafter "SDF").* At all times relevant to this motion, defendants Morton and Linda Silberstein (the "Silbersteins") and Newtown Homesteads LLC owned an assisted living facility for senior citizens in Newtown, Connecticut called The Homesteads at Newtown (collectively "Newtown Homesteads" or "Homesteads"). *SDF ¶ 2.*

In March 1999, Woodman contracted with Homesteads for the interior design of the Newtown Homesteads project. In addition to the design services provided under the contract, Woodman also purchased – on Newtown Homesteads' behalf – the furniture and furnishings Newtown Homesteads would need to operate the facility. These items are referred to in the relevant papers as "major moveables." *SDF ¶ 3.*

### The Arbor Loan to Newtown Homesteads and the Prohibitions Regarding Woodman's Ability to Seek an Advance or Downpayment

The construction financing for the project was obtained from Arbor and guaranteed by the United States Department of Housing and Urban Development ("HUD"). Arbor and Newtown Homesteads executed a building loan agreement on or about October 26, 1999 (hereafter the "Arbor Loan Agreement" or "Arbor Loan"). *SDF ¶ 4.* The certified closing statement regarding the Arbor Loan Agreement set forth the total amount to be advanced as $15,575,200, and included a specific line item – number 19 – of $622,226 for major movables. *SDF ¶¶ 5 and 6.*

In light of HUD's guarantee, Woodman could not seek an advance or downpayment for the furnishings provided to Newtown Homesteads. An October 27, 1999 Memorandum of Understanding Regarding Major Moveable Equipment executed

by Newtown Homesteads and HUD specifically provided that: (1) HUD had "agreed to insure advances for the construction of The Homesteads at Newtown"; (2) that advances for purchases would only be approved "by HUD after a HUD inspector ha[d] verified that the major moveable equipment [was] on site and that invoices for such major moveable equipment have been received"; and (3) "[u]nder no circumstances will HUD insure advances for downpayments or partial payments for major moveable equipment." *SDF ¶ 7.*

Although Woodman could not assure itself of payment by seeking an advance or downpayment, it was protected by the fact that a specific amount of the proceeds of the Arbor Loan had been earmarked for payment to Woodman once the HUD inspector had verified that the major moveable equipment was on site and that invoices for such major moveable equipment had been received. *SDF ¶ 8.*

### Woodman's Completion of Work in February 2001 and HUD's Approval of Payment to Woodman

By the end of February 2001, Woodman's work on the Newtown Homesteads project was complete. As of that date, all furniture, furnishings, accessories, window treatments and artwork approved by Newtown LLC and purchased by Woodman for Newtown Homesteads had been installed, and all work under the Design Contract was finished. The final amount due to Woodman as of the end of February was $391,834.90. *SDF ¶ 9.*

After the furnishings and other items were installed, Woodman informed Newtown Homesteads that it had prepared what is referred to alternatively as a "cut-

3

book" or a "HUD-book." Woodman was then prepared, as it has on all of the other HUD

Projects on which it has worked, to schedule a HUD inspection. *SDF ¶ 10.*

On March 27, 2001, Kathy Studdard, a vice president of Connecticut Business

Credit, Inc. ("CBI"), sent a copy of the cut-book to HUD. Kevin Tierney of CBI acted as

the Chief Development Officer of Newtown Homesteads. In her March 27, 2001 cover

letter to HUD, Ms. Studdard asked the following:

> Would you please provide me with the exact procedure for
> the payment of these major moveables - i.e. any special
> form upon which the request needs to be submitted, do we
> submit the request through Diane Champa, the time frame
> of payment - *as we would like to get these submitted and
> paid as quickly and smoothly as possible.* (Emphasis
> added.)

*SDF ¶ 11 and Exhibit 7 (emphasis added).* Diane Champa, who is referenced in the letter,

was an employee of Arbor. As of the date of Ms. Stoddard's letter, over $579,000

remained available for distribution to Woodman under the terms of the Arbor Loan

Agreement. Nevertheless, despite CBI's request for information regarding the procedure

for seeking prompt payment of the amounts due to Woodman, the inspection of the

furnishings and other items identified in the cut-book did not go forward until early May

2001, and there is nothing in the record to indicate that Ms. Champa provided a written

response to Ms. Stoddard's request for information. *Id.*

In May, 2001, HUD finally inspected the Woodman items and wrote to CBI to

confirm that the $387,275.84 owed to Woodman for those furnishings could now be

requisitioned and paid to Woodman. Although HUD's notice went on to state that HUD

was aware "the owner [was] dissatisfied with the quality and pricing of some of the items

on the list," it noted expressly that any such issues would have to be addressed directly by

the owner with Woodman. *SDF ¶ 12.* In other words, from HUD's perspective, all of the furniture and furnishings contracted for by Newtown Homesteads and the Silbersteins – and installed by Woodman at Newtown Homesteads – could now be paid for.

### Newtown Homesteads Request for Payment to Woodman

After approval from HUD, Kevin Tierney of CBI, on May 11, 2001, informed Woodman that Newtown Homesteads would arrange for a partial payment of $287,000 to Woodman by no later than May 16, 2001.[1] On or about May 17, 2001 – the day *after* the May 16 date by which Newtown Homesteads had promised the $287,000 – Linda Silberstein signed a HUD document titled "Request for Approval of Advance of Escrow Funds" (hereafter "Request for Approval"). *SDF ¶ 13.*

The Request for Approval was facsimiled to Arbor on May 17, 2001. Thus, as of the date by which Arbor received the Request for Approval, HUD had approved the requisition of the full amount due Woodman, and Newtown Homesteads had approved the payment of $287,000 to Woodman. *SDF ¶ 14.*

### Arbor's Initial Claim That It Had Not
### Received a Request for Payment from Newtown Homesteads

Despite its receipt of the HUD approval and of Newtown Homesteads' request for the payment of $287,000 to Woodman, Arbor failed to advance funds to Woodman on May 17, 2001. Arbor initially asserted that Newtown Homesteads had failed to request that the funds be advanced. Diane Champa, an employee in Arbor's Boston office to whom the Newtown Homesteads' request for payment had been sent, told Woodman's

---

[1] Although Woodman disputes the claim that there were any legitimate concerns regarding the furniture and furnishings provided to Newtown Homesteads, that dispute is irrelevant to Arbor's motion for summary judgment.

counsel in a telephone conversation in early June 2001 that Arbor "had received no such instruction." Other Arbor representatives, when contacted by Mr. Burkhardt, would neither confirm nor deny that the bank had received direction to pay Woodman, which Ms. Burkhardt understood to mean that Arbor was saying it had not received any such instruction. "But that turned out to be false," Ms. Burkhardt has testified. "They had in fact been instructed." *SDF ¶ 15.*

Indeed, Ms. Champa of Arbor had received the request from Newtown Homesteads for payment of $287,000 to Woodman on May 17, 2001 – two weeks before she told Ms. Burkhardt that Arbor had not received any such instructions. *SDF ¶ 16 and Exhibit 13.*

Arbor now contends that the form used by Newtown Homesteads was the incorrect form. In brief, Guy Milone, an associate general counsel at Arbor, testified that the form sent by Newtown Homesteads involved funds escrowed for specific items such as taxes and insurance, and that the appropriate form for the advancement of funds to Woodman was entitled "Application of Insurance for Advance of Mortgage Proceeds." Notably, however, Arbor did not inform Newtown Homesteads, CBC, or Woodman of the fact that the form was incorrect. According to Milone, he participated in a conversation with Suzanne Baran and David Fury from HUD's Connecticut office regarding the disbursement of loan proceeds to Woodman. Mr. Furey noted that the form submitted by Newtown Homesteads was the incorrect form and Mr. Milone agreed. Although Arbor would customarily have returned the form to Newtown Homesteads with instructions as to what form should be used, Arbor had decided not to do so in this instance "because of the status of the project." Further, the technical problem regarding

the appropriate form could easily have been avoided had Arbor timely responded to

CBC's request in Studdard's March 27, 2001 letter copied to Ms. Champa expressly

seeking instruction as to *"any special form upon which the request needs to be submitted .*

*. . ."* (emphasis supplied). *SDF ¶ 17.*

### *Arbor's Claim That a Mechanics Lien Prevented Payment to Woodman*

When Ms. Burkhardt provided Arbor with copies of the HUD approval and

Newtown Homesteads' request for payment, Arbor shifted ground and asserted that its

refusal was based on a mechanics lien having been placed on the Homesteads property by

the builder of the project. Arbor has relied on the same issue with respect to its failure to

notify Newtown Homesteads/CBC of the fact that it had submitted the wrong form to

obtain payment for Woodman on May 17, 2001. *SDF ¶ 18.*

Kevin Tierney of CBC, however, wrote to Arbor on May 29, 2001, noting that

Woodman had "delivered approximately $378,000 of furniture in early March *before the*

*facility opened.* HUD inspected the furniture and agreed to process any ownership

requests for payment to the vendor . . . . We understand from Diane Champa [of Arbor]

that she is unable to process the payment to Woodman even though they have nothing to

do with the real estate due to this attachment . . . ."[2] *SDF ¶ 19.*

Although representatives of HUD did tell Ms. Burkhardt that the mechanics lien

presented an obstacle to payment to Woodman, the fact remains that HUD had approved

the payment to Woodman in writing, and that no one from HUD or Arbor ever provided

any writing to Ms. Burkhardt or Woodman rescinding this approval. *SDF ¶ 25.* Further,

---

[2]      Mr. Tierney's $378,000 figure is a typographical error, but that error is not material to the pending
summary judgment motion.

despite Arbor's insistence that Woodman could not be paid in light of the mechanics lien, as set forth below, Arbor did eventually wire $150,000 to Woodman in July 2001, notwithstanding the existence of the lien. *SDF ¶ 23.*

At the time Arbor refused to transfer the funds that had been approved by both HUD and the owners, Newtown Homesteads was in arrears on the principal and interest payments due Arbor. According to an August 14, 2001 letter from Arbor to HUD, Arbor was owed $185,935.94 in interest due as of April 30, 2001. *SDF ¶ 28 and Exhibit 20.*

### *Arbor's Agreement to Make Full Payment to Woodman*

By early July 2001, Ms. Burkhardt was discussing the issue of the failure to pay Woodman with Mr. Milone of Arbor. Prior to these discussions, Ms. Burkhardt had notified Newtown Homesteads and Arbor that Woodman would take action to repossess the furniture if payment was not made promptly. By July 3, 2001, Ms. Burkhardt contacted the Newtown police and selectmen to inform them of the possibility of a repossession, and Woodman had made inquiries about the costs and logistics of repossession. *SDF ¶¶ 20-21.*

Mr. Milone then called Ms. Burkhardt with a proposal with respect to the amounts due Woodman, offering a partial payment in exchange for Woodman's commitment not to proceed with repossession. As the discussions were proceeding, Ms. Burkhardt learned about an operating deficit bond of over $1,200,000 in place with respect to the Newtown Homesteads project. In the event of an operating deficit at Newtown Homesteads, the bond would be drawn down to fund operations at Newtown Homesteads. *SDF ¶ 22.*

On July 10 or 11, 2001, Mr. Milone offered Woodman an upfront payment of $100,000 to forestall repossession. Ms. Burkhardt told Mr. Milone that $100,000 would

"not [be] enough. If we are going to sit tight for a couple of weeks and we are going to get

the balance paid when the bond is finally released, which everybody thought would be six

to eight weeks later, you have to give me more than that." Mr. Milone and Ms. Burkhardt

then negotiated the issue over the phone and Mr. Milone agreed to an initial payment of

$150,000."[3] Ms. Burkhardt then sent a brief facsimile to Mr. Milone confirming the

immediate payment of $150,000. *SDF ¶ 23.*

Ms. Burkhardt's understanding of the agreement was as follows:

> There was no dispute whatsoever that Guy Milone
> represented to me repeatedly in the phone conversations
> that subject to my agreement to not repossess the furniture
> owned by my client for some period of time and subject to
> his payment of an amount to initiate that standstill,
> [Woodman] would be paid in full with the balance that was
> due once the operating deficit bond was released. There is
> no dispute about the agreement that I had with him verbally
> repeatedly over the course of several weeks, probably even
> two months, on that subject, none whatsoever.

*SDF ¶ 24.* Although Mr. Milone disagrees with Ms. Burkhardt's memory of their

discussions, he never contested her reiteration of the agreement in an August 10, 2001

facsimile. In particular, Ms. Burkhardt wrote:

> Suzanne Baran at HUD has just advised me that the million
> dollars of bond proceeds for Newtown are to be released
> today, Friday (8/10/01) or Monday (8/13/01). She indicated
> that those bond proceeds will be sent directly to Arbor and
> Arbor will then wire out payments to various vendors. I
> will fax you the exact total due to Woodman Design and
> remind you of your repeated commitment to me over the
> past weeks that once Arbor received money, Woodman
> Design Group, our client, would be paid.

---

[3]    Arbor wired the $150,000 to Woodman on July 12, 2001, leaving a balance of over $240,000 due
and owing Woodman, excluding finance charges. Arbor wired the funds despite its initial contention that no
funds could be released in light of the mechanics lien. The $150,000 sent to Woodman on July came from
an account entitled "working capital account." *SDF ¶19.*

*SDF ¶ 24 and Exhibit 18.* Mr. Milone acknowledges having received the facsimile, and

although he has testified that he did not reach such an agreement with Ms. Burkhardt and

that he disagreed with the assertion in her facsimile that he had made "repeated"

commitments to her over the past weeks that Woodman would be paid, he did not contact

or write to Ms. Burkhardt to dispute her statements. *SDF ¶ 24.*

### The Payment of Past Due Principal and Interest to Arbor
### Out of the Proceeds from the Operating Deficit Bond

On August 14, 2001, Victor Bove of Arbor requested that HUD approve the

payment of over $670,000 to Arbor out of the proceeds of the operating deficit bond. Mr.

Bove provided a schedule of the amounts Arbor was requesting, including: (1)

$185,935.94 in interest due as of April 30, 2001; (2) $96,426.53 for interest due for May

2001; (3) $109,561.65 for principal and interest due as of July 1, 2001; and (4)

$109,561.65 for principal and interest due as of August 1, 2001. The interest and

principal debits due to Arbor were in fact paid in August 2001 out of the proceeds of the

operating deficit bond. *SDF ¶ 28.*

### Arbor's Response to the Writ of Attachment Obtained by Woodman
### After Filing Suit in Massachusetts

Woodman filed an action against Newtown Homesteads and others in state court

in Massachusetts on September 19, 2001. Homesteads removed the action to the United

States District Court for the District of Massachusetts on October 1, 2001. Arbor was

named as a trustee process defendant in the initial complaint. *SDF ¶ 29.*

On October 19, 2001, the United States District Court for the District of

Massachusetts (Young, J.) issued a writ of attachment commanding the attachment of up

to $255,000 of the real estate and/or personal property of The Homesteads of Newtown, LLC. *SDF ¶ 30.*

Also on October 19, 2001, the Court issued a Summons to Arbor as trustee requiring Arbor to disclose under oath "what goods effects or credits" of Newtown Homesteads were in its "possession at the time of service of this summons...." *Exhibit 22.* The summons expressly noted that "[s]uch good, effects or credits are hereby attached." Arbor was served with the summons on October 22, 2001 at 1:30 p.m. *SDF ¶ 31.*

As of October 22, 2001, Arbor had $333,000 in an account holding funds from the operating deficit bond. *SDF ¶ 32.*

On November 1, 2003, Arbor filed an answer to the trustee process summons stating that Arbor was not, as of the date of service of the summons, in "possession of any funds, good or credits due" Newtown Homesteads. *SDF ¶ 33.*

## ARGUMENT

### A. There are Material Issues of Fact Relating to Woodman's Claim Against Arbor for Promissory Estoppel.

Count IV of the Second Amended Complaint alleges that Arbor made promises and representations to Woodman that Woodman would be paid the amounts due and owing under its agreement with Newtown LLC for the purchase of furnishings for Newtown Homesteads. Woodman reasonably relied on the promises and representations of Arbor to its detriment by delaying taking any action to repossess the furniture and delaying legal action to recover the amounts owed to Woodman.

The Connecticut Supreme Court has stated that "under the doctrine of promissory estoppel, `[a] promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action of forbearance is binding if injustice can be avoided only by enforcement of the promise." *D'Ulisse-Cupo v. Board of Notre Dame High School*, 202 Conn. 206, 213 (1987) (quoting *Restatement of Contracts Second §90.* The Supreme Court has delineated the following elements of a promissory estoppel claim: (1) the promissor made a clear and definite promise; (2) the promisee reasonably relied on the promise; (3) the promise induced the action taken by the promisee; and (4) injustice can be avoided only by enforcement of the promise. *Id. at 213-215.*

### 1. There is a Material Issue of Fact as to Whether Arbor Promised That Woodman Would be Paid in Full on Release of the Bond Proceeds

Arbor argues that Woodman cannot establish a clear and definite promise by Arbor. In support of this contention, Arbor selectively quotes from Ms. Burkhardt's testimony regarding her discussions with Mr. Milone. As set forth above, Ms. Burkhardt testified that her memory of the agreement she struck with Mr. Milone was crystal clear. "There was no dispute whatsoever that Guy Milone represented to me repeatedly in the phone conversations that subject to my agreement to not repossess the furniture owned by my client for some period of time and subject to his payment of an amount to initiate that standstill, [Woodman] would be paid in full with the balance that was due once the operating deficit bond was released." *SDF ¶ 24.*

Arbor's contention that as Ms. Burkhardt was discussing Woodman's outstanding receivable with Mr. Milone, she understood HUD was taking the position Woodman

could not be paid out of the operating deficit bond is also based on a selective reading of her testimony. Although Ms. Burkhardt agreed that HUD was telling her Woodman could not be paid out of the terms of the operating deficit bond, she went on to note that those discussions were fluid and subject to change.

> HUD had said repeatedly, we won't pay you because you are not an operating deficit creditor. And we had the whole discussion as to why that didn't make any sense, and that was getting *revisited and rethought, and HUD told me it was getting revisited and rethought*, and that was part of the whole effort in July and August to figure out what to do with the money.

*SDF ¶ 25 (emphasis added)*. Thus, Ms. Burkhardt understood that HUD's initial position regarding the use of the bond proceeds was subject to change and was in no way an obstacle to Arbor agreeing to insure payment to Woodman upon release of the proceeds.

Finally, while Ms. Burkhardt's testimony makes clear that the release of the operating deficit bond would facilitate payment to Woodman, such an understanding does not require that the payment to Woodman come from the actual operating deficit funds. The critical factor was the *release* of the bonds proceeds. *SDF ¶ 25*. At the time of Ms. Burkhardt's agreement with Mr. Milone, the construction loan remained in place, and the last draw on the loan had been on or about April 6, 2001, bringing the amount drawn down on the loan to $14,464,428. *Arbor's Local Rule 56(a)(1) Statement ¶ 28*. As noted above, the total amount available for advance under the loan was $15,757,200. Thus, there was over $1,200,000 still available for draw under the construction loan, and the line item for major moveables remained at nearly $580,000. *SDF ¶ 11*.

### 2.    *Woodman Reasonably Relied on Arbor's Promise*

Arbor argues that Woodman could not have reasonably relied on its promise to pay Woodman in full for several reasons, none of which is persuasive. Arbor first argues that HUD's initial position that Woodman could not be paid out of the proceeds of the operating deficit bond suggests Woodman's reliance was unreasonable. As noted above, however, HUD's position remained fluid, and Ms. Burkhardt understood that HUD had not reached a final decision on the use of those funds. *SDF ¶ 25*. Moreover, even if Woodman was not ultimately paid out of the bond proceeds, it could have been paid out of the original construction loan, under which more than a million dollars remained available for an advance, including more than enough money under the major moveables line item assigned for payment to Woodman at the initiation of the project. SDF ¶ 11.

Arbor next argues that HUD's May 11, 2001 authorization permitting requisition for only those items the owner deemed "acceptable," and Arbor's role as a lender and HUD's as an insurer, negated Woodman's reliance. This is absolutely incorrect. First, at the least, the owner had already found acceptable $287,000 worth of furniture and furnishings provided by Woodman to Newtown Homesteads. Thus, at a minimum, Woodman could reasonably rely on the payment of $137,000 upon enforcement of the promise. Second, as Kevin Tierney of CBC had made clear, the owners had consistently failed to articulate with any specificity the reasons for their alleged concerns regarding Woodman's performance. As a result, Woodman could reasonably expect that the last-minute dispute raised by Newtown Homesteads with respect to the $100,000 balance would be resolved favorably to Woodman. *SDF ¶ 9*. Finally, at the time of the

discussions with Arbor, the owners had agreed that they would meet with Woodman in an attempt to resolve the dispute regarding the $100,000 they had put into dispute. *SDF ¶ 13.*

### 3.    *Woodman Forestalled Legal Action as a Result of Arbor's Promise*

Arbor contends that Woodman was not induced to take action based on Arbor's promise because Woodman did not have a right to self-help. Arbor ignores the fact that, while Woodman may have been considering self-help remedies to the extent available, an action for repossession could also have involved judicial process, including injunctive proceedings. Arbor's argument that Woodman could not have taken steps to repossess the furniture is thus far too narrow, and is notably inconsistent with its contemporaneous handling of the issue, when it declined to advise HUD of its opinion as to whether Woodman could or could not repossess the furniture and leap-frogged the issue by reaching an agreement with Woodman to forestall such action. *SDF ¶¶ 21-24.*

In the end, there can be no question that Woodman was induced to forbear on a taking immediate action to repossess the furnishings. Ms. Burkhardt's July 11, 2001 fax to Mr. Milone is unequivocal on this point:

> [Woodman] agrees that subject to the receipt by Woodman Design of $150,000 . . . by wire transfer before the close of business in Boston, tomorrow, July 12, 2001, Woodman Design agrees, until August 8, 2001, to stand still and not move to repossess the furniture and furnishings installed by Woodman Design at the Homesteads at Newtown, Newtown Connecticut, for which Woodman Design is owed some $396,000.

*SDF ¶ 23.* Woodman's president, Stephen Woodman, testified that Woodman entered into the standstill agreement "[t]o receive $150,000 and the balance of the money from the bond proceeds, so that we could be paid in full." *Id.*

### 4.    *Injustice Can Only Be Avoided by Enforcement of the Promise*

Allowing Arbor to renege on its promise to pay Woodman in full will result in a substantial injustice to Woodman – a fact Arbor seeks to avoid by arguing Woodman has not been damaged because it still had the right to seek repossession after the end of the standstill period. The argument is speculative, however, because it is premised on a contention that Woodman's immediate pursuit of its remedies in early July 2001, before the release of the operating deficit bond, would not have resulted in the payment of the full amounts due to Woodman at the time. There can be no question that Woodman was giving up something it viewed as valuable, and that Arbor and HUD also viewed as important to avoid: an immediate action for repossession.[4]

Arbor's contention that Woodman has not been damaged by Arbor's failure to live up to its bargain fails to account for the simple fact that Woodman was not paid the amounts it expected to be paid as a result of the agreement. Had Arbor fulfilled its promise, Woodman at a minimum would have been paid the $137,000 difference between the $287,000 approved by Newtown Homesteads in May 2001 and the $150,000 paid by Arbor in July 2001, and may very well have been paid the full amount due and owing – or a substantial equivalent – in light of Newtown Homesteads' willingness to discuss a resolution of the dispute created by its failure to requisition the full amount due to Woodman.

---

[4]    The fact that Woodman did not seek repossession as soon as the standstill period ended does not, as Arbor contends, mean Woodman had concluded a repossession effort would be fruitless. After the standstill period first expired, discussions regarding the use of the bond proceeds were ongoing, and Arbor did not say immediately that Woodman would not be paid from those proceeds. Notably, at the time, Arbor was seeking the lion's share of the proceeds for interest and principal payments due to it. Further, the decision as to whether to seek repossession after Arbor had made clear that it would not stand by its initial promise does not elucidate what may have happened had Woodman not agreed to standstill in early July 2001.

Finally, as it stands now, the Newtown Homesteads facility continues to operate with the furniture and furnishings provided by Woodman, the bond proceeds were used, in substantial part, to keep payments due to Arbor current though the summer of 2001 and avoid Arbor's assignment of the loan back to HUD during that time period, and Arbor has been largely made whole with respect to its loan to Newtown Homesteads as a result of HUD's decision to fund its guaranty. Woodman, however, has received only a fraction of what it was owed for the furniture it bought, paid for, and delivered to Newtown Homesteads. Simply put, Woodman has been treated inequitably, and injustice can be avoided only by enforcement of Arbor's promise.

**B.**     ***There are Material Issues of Facts Relating to Woodman's Claim Against Arbor for Misrepresentation***

As Arbor concedes, Woodman's misrepresentation claim is based largely on the same facts set forth above with respect to the promissory estoppel claim. In light of the disputed issues of fact discussed above, Woodman's claims for both intentional and negligent misrepresentation should not be dismissed.

An action for intentional misrepresentation requires proof of four elements: (1) a false representation was made as a statement of fact; (2) it was untrue and was known to be untrue by the party making it; (3) it was made to induce the other party to act on it; and (4) the other party acted on the representation to his injury. *Web Press Service Corp. v. New London Motors, Inc.*, 203 Conn. 342, 362, 525 A.2d 57 (1987).

Here, as set forth above, Woodman will provide testimony that it was told unequivocally by Arbor that the balance due would be paid after release of the operating deficit bond – providing Woodman agreed to forbear on its repossession action at a

critical juncture. Whether that statement by Arbor was made is, of course, a question of fact. Arbor says the statement was not made; Woodman says it was. Ultimately, the issue can only be resolved by a fact finder; it cannot be resolved on summary judgment.

Moreover, Arbor's failure to comply with an earlier indication of its intent can form the basis of a misrepresentation claim providing Arbor had no intent to fulfill the promise when made. *Paiva v. Vanech Heights Constr. Co., 159 Conn. 512 (1970)* ("Although the general rule is that a misrepresentation must relate to an existing or past fact, there are exceptions to this rule, one of which is that a promise to do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation."). This too presents a question of fact that may only be resolved at trial. The evidence shows that on the day after Mr. Milone struck his bargain with Ms. Burkhardt, he was informed of a letter faxed by HUD to Linda Silberstein at Newtown Homesteads outlining the proposed uses of the operating deficit bond. *SDF ¶ 27.* Woodman was conspicuously absent from the list while Arbor was front and center, with a $387,410.47 line item for the payment of interest – more than four times the amount due to the next highest creditor on the list. *Id.* In light of Mr. Milone's knowledge regarding the proposed use of the bond proceeds, a jury may find that Arbor, in fact, had no intention of paying Woodman upon release of the bond proceeds despite its promise to do so.

In addition to intentional misrepresentation, the Connecticut Supreme Court has also recognized the tort of negligent misrepresentation. *D'Ulisse Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 520 A.2d 217 (1987). "One who, in the course of his business, profession or employment . . . supplies false information for

the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Id., at 218. Here, whatever Mr. Milone may have believed initially about Arbor's commitment to have Woodman paid in full from the proceeds of the bond, that belief was negligent given what he knew or should have known about HUD's initial list of creditors to be paid from the bond.[5] There are, therefore, material issues of fact as to whether made negligent misrepresentations to Woodman.

### C.    Woodman's Unfair and Deceptive Trade Practices Claim Against Arbor Should Not be Dismissed

The Connecticut Unfair Trade Practices Act ("CUPTA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or practice." General Statutes 42-110b(a). "[A]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b" is entitled to actual damages and, at the discretion of the court, punitive damages, equitable relief and attorneys fees. General Statutes 42-110g(a) and (d).

An act may be found unfair or deceptive within the meaning of CUPTA if it "is within at least the penumbra of some common law, statutory or other established conduct of fairness" or if it is "unethical, oppressive or unscrupulous." *Chem-Tek, Inc. v. Gen'l Motors Corp.,* 816 F. Supp. 123, 130 (D. Conn. 1993). In support of its contention that it

---

[5]    As noted above, Woodman acknowledges that HUD was claiming Woodman would not be paid out of the bond proceeds, but that does not alter the fact that HUD was also telling Woodman the use of the bond proceeds remained under discussion.

is entitled to summary judgment on Woodman's CUPTA claim, Arbor relies exclusively

on its previous arguments regarding the promissory estoppel and misrepresentation

claims. First, Arbor argues that it did not commit a deceptive act or practice. The

evidence, however, reveals that whether Arbor acted inconsistently with the dictates of

CUPTA is far from undisputed on a number of fronts, particularly when Arbor's

interactions with Woodman, Newtown Homesteads, HUD, and the United States District

Court for the District of Massachusetts are viewed in their totality:

- Arbor was notified as early as March 27, 2001 in Kathy Studdard's letter to HUD that Woodman had fully performed and that Newtown Homesteads, through Kevin Tierney, its chief development officer, was anxious to understand the procedure to follow to pay Woodman. *SDF ¶ 11.* As of this date, however, Newtown Homesteads was either in or nearing arrears with respect to its payments to Arbor, and a fact finder is entitled to infer that Arbor's failure to facilitate the payment to Woodman was motivated at least in part by its concerns regarding the status of the project – and the timely payment of principal and interest to the bank. *SDF ¶¶ 27-28.*

- Arbor played cat-and-mouse with Woodman in the May and June 2001 time frame, first telling Ms. Burkhardt that it had not received a requisition from Newtown Homesteads regarding the payment of the $287,000 to Woodman and then, after Ms. Burkhardt facsimiled copies of the relevant documents, raising the issue of a mechanics lien as an impediment to payment to Woodman. *SDF ¶¶ 15-18.*

- Although Arbor asserts now that Newtown Homesteads used the wrong form when it requisitioned the $287,000 it had agreed to pay Woodman, it did not inform Homesteads, CBC or Woodman of that fact. *SDF ¶ 17.*

- The argument that the lien was an impediment to payment was ultimately belied by the fact that $150,000 was wired to Woodman on July 12, 2001 notwithstanding any such lien. *SDF ¶ 23.*

- Mr. Milone repeatedly told Ms. Burkhardt that Arbor would arrange for full payment to Woodman once the proceeds of the operating deficit bond were released. *SDF ¶ 24.*

- With respect to Ms. Burkhardt's agreement with Mr. Milone – an associate general counsel at Arbor – Ms. Burkhardt testified that she "relied, as a member of the bar, on the word of another member of the bar that was given to me verbally on repeated occasions, that in exchange for partial payment we would stand still, and at the end of the standstill period, when the bond was released, we would get paid. *Id.*

- During and immediately after the standstill period, Arbor was maneuvering with HUD to be sure that Arbor was paid all interest due to it. *SDF ¶ 28.*

- During this maneuvering, Arbor was well aware of the fact that Woodman was seeking payment from the same pool of funds and that, notwithstanding its initial claim that the bond funds could not be used for this purpose, HUD was actively considering paying Woodman out of the bond proceeds. *SDF ¶ 26.*

- The payment of interest due to Arbor was far from the type of payment that HUD had said ought to be made under the concept of the operating deficit bond; according to Mr. Milone, the primary concern was "the health, safety and welfare of the tenants because it was an assisted living facility and providing services to them and being careful to identify what those services were to have them on the operating deficit list to be paid." *SDF ¶ 26.* Under this definition, the furniture and furnishings provided by Woodman would take precedence with respect to the residents over the payment of interest to the bank under its construction loan.

- After Woodman initiated this litigation in Massachusetts and obtained an attachment on the "goods effects or credits" of Newtown Homesteads, Arbor filed an answer with the United States District Court in Boston denying that it had any such funds. Notwithstanding its denial, at the time of its answer, Arbor still had $333,000 in the operating deficit account of Newtown Homesteads. *SDF ¶¶ 26.*

In sum, there is more than sufficient evidence to bring to trial Woodman's claim that Arbor acted unfairly, unethically, oppressively or unscrupulously in its dealing with Woodman stretching as far back as March 2001 and continuing through November 2001. *Chem-Tek, Inc. v. Gen'l Motors Corp.,* 816 F. Supp. 123, 130 (D. Conn. 1993).

Arbor next argues that Woodman could have avoided any alleged damages by declining the agreement offered by Mr. Milone; from Arbor's vantage point, the

agreement was ephemeral because Woodman could not be paid out of the bond proceeds.
As an initial matter, it is preposterous to suggest that Arbor can act unfairly and
deceptively but then avoid a claim by arguing that the injured party should have realized
its representations were deceptive.[6] Substantively, Arbor's contention is not borne out by
the facts. Ms. Burkhardt testified that, while HUD had told her Woodman could not be
paid out of the bond proceeds, she was also told that the use of the proceeds remained
under discussion, and that Woodman could ultimately be included. *SDF ¶ 25*. Closer to
home, Mr. Milone acknowledged that HUD was, in fact, considering paying Woodman
from the bond proceeds. *SDF ¶ 26*.

      Finally, Arbor argues that Woodman did not suffer any damages because it could
still have repossessed the furniture in August. As noted above, the argument overlooks
the fact that the landscape had changed by the time Arbor reneged on its promise. Further,
Arbor's unfair and deceptive practice in side-stepping the attachment ordered by Judge
Young in Massachusetts has damaged Woodman in that it has eliminated an avenue of
security relating to Woodman's claims against Newtown Homesteads.

### D. Woodman's Breach of Contract and Implied Covenant Claims Should Not Be Dismissed

      Arbor seeks to dismiss Woodman's breach of contract claim by arguing that Ms.
Burkhardt's decision not to expressly reference Mr. Milone's agreement regarding
payment after the release of the bond proceeds suggests "she doubted an agreement had
been reached . . . ." Arbor Memo p. 33. In making the argument, Arbor seeks to transform

---

[6]     Arbor does not point to any case law to suggest that CUPTA incorporates a reasonable reliance
standard. In any event, Woodman's reliance was reasonable, for the reasons discussed in the promissory
estoppel and misrepresentation sections of this memorandum.

Ms. Burkhardt's July 11 facsimile into a complete and absolute expression of the parties agreement. This is unavailing for several reasons.

First, Ms. Burkhardt made clear that the agreement regarding the use of the bond proceeds was an explicit, oral agreement, and Arbor cites no law to suggest such an agreement could not be reached.

Second, there is nothing in the July 11 facsimile to suggest that it is the complete agreement between the parties. There is no merger clause, nor any suggestion anywhere that previous oral discussions had in some way been overtaken by the facsimile.

Third, although Arbor's memorandum is liberally peppered with caustic – and largely irrelevant – remarks regarding Ms. Burkhardt's decision not to confirm in writing to Mr. Milone the full scope of their agreement, her reasons for doing so do not negate her testimony regarding the specific agreement she reached with Mr. Milone. Moreover, while Arbor seems bemused by Ms. Burkhardt's decision to leave the agreement regarding actions to be taken after the release of the bond proceeds out of the written record, there can be little doubt that attorneys make such decisions every day. Here, Ms. Burkhardt's decision was eminently reasonable, particularly in light of the fluid nature of the discussions she knew Arbor was pursuing with HUD regarding the uses of the operating deficit bond. A written reference to those uses before Arbor and HUD had finalized their discussions – and before the bond had been paid – may have presented a problem for Mr. Milone. As Ms. Burkhardt testified, her relationship with Arbor to this point had been cordial, and she saw no reason to jeopardize that relationship. *SDF ¶ 20; Burkhardt Tr. pp. 96-97.*

Arbor also argues that the agreement is unenforceable because the consideration – Woodman's forbearance on repossession – was invalid. Again, Arbor's view of the scope of Woodman's forbearance is too limited. While Woodman may not have been able to pursue the self-help remedies it had begun to investigate, it certainly could have initiated a judicial repossession, and could have sought injunctive relief just as the negotiations regarding the bond proceeds were getting going.

Arbor's argument that Woodman's breach of the implied covenant claim should be dismissed is premised on its view that Woodman does not have a valid breach of contract. Because that premise is faulty, as discussed above, so too is the argument that the implied covenant claim should be dismissed.

### E. Woodman's Tortious Interference Claim Must Not Be Dismissed

Woodman had a contract with Newtown Homesteads pursuant to which Woodman purchased the furniture and furnishings for the senior living facility in Newtown, Connecticut. On May 17, 2001, Newtown Homesteads approved the partial payment of $287,000 to Woodman. Those funds were available for advancement under the terms of the construction loan between Newtown Homesteads and Arbor, but Arbor failed to advance the funds to Woodman. The failure to advance the funds caused Newtown Homesteads to breach its agreement with Woodman. Arbor's motivation for causing the breach was to preserve funds under the construction loan agreement for the payment of interest to Arbor. As of May 2001, Newtown Homesteads had failed to make its April 2001 interest payment, and in light of the Homesteads' eventual failure to make May and June interest payments, it is fair to infer that Arbor was concerned about future interest payments as well. *SDF ¶ 28.*

Arbor argues that its conduct was not a tortious interference because it was acting within its own rights and was simply following the terms and conditions of its loan document and the federal regulations in light of Newtown Homesteads' "default." Arbor, however, cannot point to a single document declaring the loan in default in May 2001. Further, the federal regulations provide without qualification that the mortgagee "shall be obligated, as part of the mortgage transaction, to disburse the principal amount of the mortgage to the . . . mortgagor's creditor's for the mortgagor's account, subject to the mortgagor's consent." 24 CFR§ 200.81. There is no mention in the regulation regarding the effect of a default.

Further, Arbor's building loan agreement with Newtown Homesteads provides that Arbor "*shall* advance to [Newtown Homesteads] . . . out of the proceeds of the loan, amounts for the application to the charges or items enumerated below, but only to the extent such charges have accrued, or that the [Newtown Homesteads] is otherwise entitled to payment on account of such items." *SDF ¶ 4 and Ex. 3 (emphasis added).* Here, the Woodman charges had accrued months before Newtown Homesteads requisitioned the $287,000 for Woodman on May 17, 2001. Further, given that HUD had inspected the furniture and furnishings provided by Woodman in early May 2001 and had approved all of it for advancement, Newtown Homesteads was "entitled to payment on account of such items."

Arbor argues that it nonetheless had no obligation to advance the funds for payment of the Woodman receivable because Homesteads had "defaulted" on its loan. It is correct that the building loan agreement provides that Arbor shall advance funds "as long as the loan remains in balance and the Borrower is not in default hereunder . . . ."

*SDF ¶ 4 and Ex. 3.* Neither Arbor nor HUD, however, have produced a single document showing that the loan was declared to be in "default" or "out of balance" in May 2001.

### F. Woodman's Breach of Fiduciary Duty Claim Should Not be Dismissed

Arbor argues that it owed no fiduciary duty to Woodman because it was simply a lender enforcing the terms of its agreement with its borrower. Arbor Memorandum p. 35. The argument overlooks several factors. First, as Arbor is often wont to point out, the nature of a HUD-guaranteed loan for a senior facility such as Newtown Homesteads is unique. Woodman was identified from the outset of the project by Arbor as the provider of the bulk of the major moveables. Arbor reviewed Woodman's submittals regarding its services and found them to be reasonable. *SDF ¶ 6 and Ex. 5.* The initial closing schedule expressly delineated a line item of $622,226 for major moveables. Woodman in turn was forbidden from seeking a downpayment, cash on delivery, or other form of security for the hundreds of thousands of dollars of items it was agreeing to provide to Newtown Homesteads. *SDF ¶ 7.* Although it could not seek security, Woodman believed that the funds allocated for major moveables were held in escrow for its benefit. *SDF ¶ 8.* In light of these circumstances, Woodman reasonably considered Arbor to be holding funds due to it and in a relationship of trust to Woodman.

While the nature of the relationship here is concededly distinct from the ordinary fiduciary relationship, the existence here of: (i) a line item earmarking funds for Woodman; (ii) restraints on Woodman's ability to seek security; (iii) a particularized role played by Arbor in overseeing the payment to vendors such as Woodman; and (iv) Arbor's eventual control of the funds paid out under the operating deficit account is sufficient to establish a question of fact as to whether there existed a "unique degree of

trust and confidence between the parties, one of whom has superior knowledge, skill or

expertise and is under a duty to represent the interests of the other." *Dunham v. Dunham,*

*204 Conn. 303, 322 (1987).* Woodman's breach of fiduciary duty claim should therefore

not be dismissed.

## **CONCLUSION**

For the reasons set forth above, plaintiff Woodman Design Group., Inc.

respectfully requests that the Court deny defendant Arbor Commercial Mortgage, LLC's

Motion to for Summary Judgment.

Respectfully submitted,
Woodman Design Group, Inc.

By its attorneys,

Brian E. Whiteley
Federal Bar No. CT23223
For Scibelli and Whiteley, LLP
45 School Street, Third Floor
Boston, MA 02108
(617) 227-5725

Marc P. Mercier
Federal Bar No. ct10886
For Beck and Eldergill, P/C.
447 Center Street
Manchester, CT 06040
(860) 646-5606

Dated: November 3, 2003

## CERTIFICATE OF SERVICE

I, Brian E. Whiteley, hereby certify that I caused a true and accurate copy of the foregoing document to be served by Federal Express on

Constantinos G. Panagopoulos, Esq.
Ballard Spahr
601 13th Street, N.W., Suite 1000 South
Washington, DC 20005

And by First Class Mail on

Martin L. McCann. Esq.
Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd.
PO Box 1740
Bridgeport, CT  06601

Patrick W. Boatman, Esq.
Boatman, Boscarino, Grasso and Twchtman
628 Hebron Avenue
Glastonbury, CT 06033

Brian E. Whiteley