UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2003 NOV -4  A 10: 02

US DISTRICT COURT
BRIDGEPORT CT

|  |  |
|---|---|
| WOODMAN DESIGN GROUP, INC. ) ) Plaintiff, ) ) V. ) ) ) ) ) THE HOMESTEADS OF NEWTOWN, LLC., ) MORTON SILBERSTEIN, ) LINDA SILBERSTEIN, and ) ARBOR COMMERCIAL MORTGAGE LLC ) ) Defendants ) ) ) | Civil Action No. 3:01 CV-2029 (SRU)  November 3, 2003 |

**PLAINTIFF WOODMAN DESIGN GROUP, INC.'S
LOCAL RULE 56(a)(2) STATEMENT**

*RESPONSE TO ARBOR'S LOCAL RULE 56(a)(1) STATEMENT*

1. Admitted.

2. Admitted.

3. Denied as to what the Operating Deficit Escrow is to be "specifically" used for. The Firm Commitment document speaks for itself. Further, the escrow was used in August 2001 to pay amounts due on the building loan, including interest arrears. *Exhibit 20; Milone Tr. p. 135.*[1]

4. Admitted.

5. Admitted.

6. Admitted.

7. Denied. The Construction Loan Disbursement Agreement speaks for itself. Further, this procedure was not followed on all occasions. The $150,000 payment to Woodman, for example, discussed below, was made without following the procedure described in paragraph 7. *Milone Tr. pp. 91-92.*

8. Admitted.

9. The first and third sentences are admitted. The documents attached as Exhibit 5 do not provide sufficient information to admit or deny the second sentence and Woodman therefore denies the second sentence.

10. Admitted.

11. Admitted.

12. Admitted.

13. Denied. *See, e.g., Woodman's Statement of Facts ¶¶ 6, 21-27, and 32.*

14. Admitted providing that the term "opened" is referencing tenant occupancy.

15. First sentence admitted. Second sentence denied. *Burkhardt Tr. 62.*

16. Denied. *Burkhardt Tr.* 64 ("I had many conversations with [HUD's], and I had very detailed conversations about what they were supposed to be doing.").

---

[1] Unless otherwise noted, references to exhibits and deposition transcripts are to those documents attached hereto rather than to the exhibits and transcripts attached to Arbor's Local Rule 56(a)(1) Statement.

17. Woodman admits that its counsel sent letters to Homesteads and its agents demanding payment of the overdue amounts and notifying Homesteads of the potential for legal action. Woodman denies the characterizations of counsel's letters. Woodman admits that exhibits 8 and 9 are true and accurate copies of letters sent by its counsel.

18. Admitted.

19. Admitted.

20. Admitted.

21. Exhibits 13, 14, 19, and 20 are true and accurate copies. Woodman denies the characterization of those letters in the first sentence of paragraph 21.

22. Denied. *See Exhibit 13* (confirming May 17, 2001 receipt by Arbor of request for advance.)

23. Denied. *See Exhibit 4.*

24. Denied. *Exhibit 15 to Arbor's Local Rule 56(a)(1) speaks for itself.*

25. Denied. *Exhibit 16 to Arbor's Local Rule 56(a)(1) is a request for approval of escrow funds.*

26. Admitted.

27. Woodman admits that that Arbor sought a title update on May 17, 2001. Arbor has not provided a copy of the title report and Woodman can not admit or deny what the report states.

28. Denied. Arbor has not provided a copy of the title report and Woodman can not admit or deny what the report states. Further, Exhibit 16 to Arbor's Local Rule 56(a)(1) Statement is not Requisition Request No. 16.

29. Denied. *See, e.g., Woodman's Statement of Facts ¶¶ 10-19*.

30. Admitted.

31. Woodman admits that its counsel sent the letters attached as Exhibits 21 and 22. Woodman denies Arbor's characterization of those letters.

32. Denied. *Burkhardt Tr. pp. 124-127*.

33. Woodman admits that Ms. Burkhardt discussed repossession with Mr. Fury and sought HUD's assistance with Arbor. Woodman denies the characterization of Ms. Burkhardt's testimony. Burkhardt Tr. pp. 32-33.

34. Woodman admits that this is what Ms. Burkhardt perceived was HUD's response but Woodman cannot admit or deny what HUD did in its interactions with Arbor and Newtown. Burkhardt Tr. pp. 32-33.

35. Woodman admits that Ms. Burkhardt contacted Mr. Cohen. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

36. Woodman admits that Ms. Burkhardt's testimony is accurately quoted. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

37. Woodman admits that Ms. Burkhardt's testimony is accurately quoted. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

38. Woodman admits that Ms. Burkhardt testified about statements made to her by HUD. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

39. Woodman admits that Ms. Burkhardt never learned of a change in position by HUD.

40. Woodman's admits that HUD representatives told Ms. Burkhardt as of July 11 that Woodman would not be paid out of the operating deficit bond. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

41. Woodman admits that Ms. Burkhardt discussed the possibility of repossessing the furniture and the ramifications of any such action with Arbor and HUD. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

42. Admitted.

43. Woodman admits that this was Mr. Milone's testimony.

44. Denied. *Milone Tr. pp. 130-131.*

45. Woodman admits that Ms. Burkhardt's testimony is accurately quoted. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

46. Woodman admits that the facsimile is quoted accurately. Woodman denies Arbor's characterization of the facsimile.

47. Admitted.

48. Admitted.

49. Woodman admits that its counsel sought payment for Woodman out of the proceeds of the operating deficit bond. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

50. Woodman admits that Ms. Burkhardt's testimony is accurately quoted. Woodman denies Arbor's characterization of Ms. Burkhardt's testimony.

51. Woodman admits that its counsel sent the facsimile dated August 7, 2001. Woodman denies Arbor's characterization of the facsimile.

52. Denied in light of Arbor's failure to designate the transcript citation.

53. Woodman admits that its counsel sent the facsimile dated August 10, 2001. Woodman denies Arbor's characterization of the facsimile.

54. Denied. *See Woodman's Statement of Facts ¶¶ 1-33.*

## WOODMAN'S STATEMENT OF FACTS, INCLUDING DISPUTED ISSUES OF FACT

1. Woodman provides interior design services to businesses in the healthcare industry. These services include not only the preparation of overall design concepts, but also the recommendation, selection, purchase, and installation of furniture and furnishings. *Exhibit 1.*

2. During the years 1999 through at least September 30, 2001, defendants Morton and Linda Silberstein (the "Silbersteins") and Newtown Homesteads LLC ("Homesteads LLC") owned an assisted living facility for senior citizens in Newtown, Connecticut called The Homesteads at Newtown ("Newtown Homesteads"). *Exhibit 2.*

3. In March 1999, Woodman contracted with Homesteads LLC for the interior design of the Newtown Homesteads project (the "Design Contract"). In addition to the services provided under the Design Contract, Woodman also purchased – on Newtown Homesteads' behalf – the furniture and furnishings Homesteads LLC would need to operate the facility. These items are referred to in the relevant papers as "major moveables." *Exhibit 1.*

4. The construction financing for the project was obtained from Arbor and guaranteed by the United States Department of Housing and Urban Development ("HUD"). The financing commitment was made in a building loan agreement from Arbor to Newtown Homesteads dated October 26, 1999 (hereafter the "Arbor Loan Agreement"). *Exhibit* 3.

5. The certified closing statement signed by Arbor and Newtown Homesteads regarding the Arbor Loan Agreement set forth the total amount to be advanced as $15,575,200, and included a specific line item – number 19 – of $622,226 for major movables. *Exhibit* 4.

6. The major moveables line item had been approved as reasonable by Arbor in its firm commitment underwriting summary. *Exhibit 5.*

7. In light of HUD's guarantee, Woodman could not seek an advance or downpayment for the furnishings provided to Newtown Homesteads. An October 27, 1999 Memorandum of Understanding Regarding Major Moveable Equipment executed by Newtown Homesteads and HUD specifically provided that: (1) HUD had "agreed to insure advances for the construction of The Homesteads at Newtown"; (2) that advances for purchases would only be approved "by HUD after a HUD inspector ha[d] verified that the major moveable equipment [was] on site and that invoices for such major moveable equipment have been received"; and (3) "[u]nder no circumstances will HUD insure advances for downpayments or partial payments for major moveable equipment." *Exhibit 6.*

7

8. Although Woodman could not assure itself of payment by seeking an advance or downpayment, it was protected by the fact that a specific amount of the proceeds of the Arbor Loan had been earmarked for payment to Woodman once the HUD inspector had verified that the major moveable equipment on site and that invoices for such major moveable equipment have been received. *Exhibit 3*. Woodman believed that the funds due to it were held in escrow. *Deposition Transcript of Stephen Woodman p. 41 (hereafter "Woodman Tr.") (A complete copy of the transcript is attached hereto as Exhibit 25)*.

9. By the end of February 2001, Woodman's work on the Newtown Homesteads project was complete. Woodman Tr. p. 13. As of that date, all furniture, furnishings, accessories, window treatments and artwork previously approved by Newtown LLC and purchased by Woodman for Newtown Homesteads had been installed, and all work under the Design Contract was finished. *Id.* The final amount due to Woodman as of the end of February was $391,834.90. *Exhibit 7*.

10. After the furnishings and other items were installed, Woodman informed Newtown Homesteads that it had prepared what is referred to alternatively as a "cut-book" or a "HUD-book." *Exhibit 8*.

11. On March 27, 2001, Kathy Stoddard, a vice president of Connecticut Business Credit, Inc. ("CBI"), sent a copy of the cut-book to HUD. *Exhibit 8*. Kevin Tierney of CBI acted as the Chief Development Officer of Newtown Homesteads. *Exhibit 7*. In her March 27, 2001 cover letter to HUD, Ms. Stoddard asked the following:

8

> Would you please provide me with the exact procedure for the payment of these major moveables - i.e. any special form upon which the request needs to be submitted, do we submit the request through Diane Champa, the time frame of payment - as we would like to get these submitted and paid as quickly and smoothly as possible.

Ex. 9. Diane Champa, who is referenced in the letter, was an employee of Arbor. As of the date of Ms. Stoddard's letter, over $579,000 remained available for distribution to Woodman under the terms of the Arbor Loan Agreement. *Exhibit 10*. Nevertheless, despite CBI's request for information regarding the procedure for seeking prompt payment of the amounts due to Woodman, the inspection of the furnishings and other items identified in the cut-book did not go forward until April 30, 2001. *Arbor Rule 56(a)(1) Statement ¶ 18*. There is nothing in the record to indicate that Ms. Champa provided a written response to Ms. Stoddard's request for information.

  12. In May 2001, after its inspection, HUD wrote to CBI to confirm that the $387,275.84 owed to Woodman for those furnishings could now be requisitioned and paid to Woodman. *Exhibit 11*. Although HUD's notice went on to state that HUD was aware "the owner [was] dissatisfied with the quality and pricing of some of the items on the list," it noted expressly that any such issues would have to be addressed directly by the owner with Woodman. *Id*.

  13. After approval from HUD, Kevin Tierney of CBI, on May 11, 2001, informed Woodman that Newtown LLC would arrange for a partial payment of $287,000 to Woodman by no later than May 16, 2001. *Exhibit 12*. On or about May 17, 2001 – the day *after* the May 16 date by which defendants' had

promised the $287,000 – Linda Silberstein signed a HUD document titled "Request for Approval of Advance of Escrow Funds" (hereafter "Request for Approval"). *Exhibit 13.*

14.     The Request for Approval was facsimiled to Arbor on May 17, 2001. *Id.*

15.     Despite its receipt of the HUD approval and of Newtown Homesteads' request for the payment of $287,000 to Woodman, Arbor failed to advance funds to Woodman. Arbor initially asserted that Newtown Homesteads had failed to request that the funds be advanced. *Deposition Transcript of Ellen Burkhardt at p. 68 (hereafter "Burkhardt Tr.")* (A complete copy of the transcript is attached hereto as *Exhibit 26*); *see also Exhibit 14.* Diane Champa, an employee in Arbor's Boston office to whom the Newtown Homesteads' request for payment had been sent, told Woodman's counsel in a telephone conversation in early June 2001 that Arbor "had received no such instruction." *Id.* Other Arbor representatives, when contacted by Mr. Burkhardt, would neither confirm nor deny that the bank had received direction to pay Woodman, which Ms. Burkhardt understood to mean that Arbor was saying it had not received any such instruction. "But that turned out to be false," Ms. Burkhardt has testified. "They had in fact been instructed." *Burkhardt Tr. Pp. 68-69; see also Exhibit 15.*

16.     Indeed, Ms. Champa of Arbor had received the request from Newtown Homesteads for payment of $287,000 to Woodman on May 17, 2001 – two weeks before she told Ms. Burkhardt that Arbor had not received any such instructions. *Exhibit 13.*

17.   Arbor contends that the form used by Newtown Homesteads was the incorrect form. In brief, Guy Milone, an associate general counsel at Arbor, testified that the form sent by Newtown Homesteads involved funds escrowed for specific items such as taxes and insurance, and that the appropriate form for the advancement of funds to Woodman was entitled "Application of Insurance for Advance of Mortgage Proceeds." *Deposition Transcript of Guy R. Milone, Jr. at pp. 30-34 (hereafter "Milone Tr.")* (A complete copy of the transcript is attached hereto as *Exhibit 27*.) Notably, however, Arbor did not inform Newtown Homesteads, CBC, or Woodman of the fact that the form was incorrect. *Id.* According to Mr. Milone, he participated in a conversation with Suzanne Baran and David Fury from HUD's Connecticut office regarding the disbursement of loan proceeds to Woodman. Mr. Furey noted that the form submitted by Newtown Homesteads was the incorrect form and Mr. Milone agreed. Although Arbor would customarily have returned the form to Newtown Homesteads with instructions as to what form should be used, Arbor had decided not to do so in this instance "because of the status of the project." *Id.*

18.   When Ellen Burkhardt, counsel to Woodman, provided Arbor with copies of the HUD approval and Newtown Homesteads' request for payment, Arbor asserted that its refusal was based on a mechanics lien having been placed on the Homesteads property by the builder of the project. *Burkhardt Tr. p. 81.*

19.   Kevin Tierney of CBC, however, wrote to Arbor on May 29, 2001, noting that Woodman had "delivered approximately $378,000 of furniture in early March *before the facility opened*. HUD inspected the furniture and agreed to

11

process any ownership requests for payment to the vendor . . . . We understand from Diane Champa [of Arbor] that she is unable to process the payment to Woodman even though they have nothing to do with the real estate due to this attachment . . . ." *Exhibit 16 (emphasis added).* Moreover, the existence of the mechanics lien did not prevent the transfer of $150,000 to Woodman in July 2001, as discussed below. *Milone Tr. pp. 91-92.*

20. By early July 2001, Ms. Burkhardt was discussing the issue of the failure to pay Woodman with Mr. Milone of Arbor. *Burkhardt Tr. pp. 96-97.* Prior to these discussions, Ms. Burkhardt had notified Newtown Homesteads and Arbor that Woodman would take action to repossess the furniture if payment was not made promptly. *Id. At pp. 97-98.* By July 3, 2001, Ms. Burkhardt contacted the Newtown police and selectmen to inform them of the possibility of a repossession, and Woodman had made inquiries about the costs and logistics of repossession. *Id.*

21. The prospect of repossession was problematic to Arbor and HUD. HUD asked Mr. Milone whether Woodman could repossess the furniture. Mr. Milone said that he could not advise Arbor on that point and would have to engage counsel in Connecticut. *Milone Tr. pp. 76-77.* HUD then asked Mr. Milone to buy as much time as possible from Woodman to forestall repossession. *Milone Tr. pp. 79-81.*

22. Mr. Milone then called Ms. Burkhardt with a proposal with respect to the amounts due Woodman, offering a partial payment in exchange for Woodman's commitment not to proceed with repossession. *Id. at 99.* As the

12

discussions were proceeding, Ms. Burkhardt learned about an operating deficit bond of over $1,200,000 in place with respect to the Newtown Homesteads project. In the event of an operating deficit at Newtown Homesteads, the bond would be drawn down to fund operations at Newtown Homesteads. *Id.*

23. On July 10 or 11, Mr. Milone offered Woodman an upfront payment of $100,000 to forestall repossession. Ms. Burkhardt said, "[t]hat's not enough. If we are going to sit tight for a couple of weeks and we are going to get the balance paid when the bond is finally released, which everybody thought would be six to eight later, you have to give me more than that." *Id. at 100.* Mr. Milone and Ms. Burkhardt then negotiated the issue over the phone and Mr. Milone agreed to an initial payment of $150,000." *Id.* Ms. Burkhardt then sent a brief facsimile to Mr. Milone confirming the immediate payment of $150,000. *Exhibit 17.* Woodman entered into the standstill agreement "[t]o receive $150,000 and the balance of the money from the bond proceeds, so that we could be paid in full." *Woodman Tr. p. 62.*

24. Ms. Burkhardt's understanding of the agreement was as follows:

> There was no dispute whatsoever that Guy Milone represented to me repeatedly in the phone conversations that subject to my agreement to not repossess the furniture owned by my client for some period of time and subject to his payment of an amount to initiate that standstill, [Woodman] would be paid in full with the balance that was due once the operating deficit bond was released. There is no dispute about the agreement that I had with him verbally repeatedly over the course of several weeks, probably even two months, on that subject, none whatsoever.

*Burkhardt Tr. pp. 122-123.* Mr. Burkhardt "relied, as a member of the bar, on the word of another member of the bar that was given to me verbally on repeated occasions, that in exchange for partial payment we would stand still, and at the end of the standstill period, when the bond was released, we would get paid." *Burkhardt Tr. p. 129.* Although Mr. Milone disagrees with Ms. Burkhardt's memory of their discussions, he never contested her reiteration of the agreement in an August 10, 2001 facsimile. In particular, Ms. Burkhardt wrote:

> Suzanne Baran at HUD has just advised me that the million dollars of bon proceeds for Newtown are to be released today, Friday (8/10/01) or Monday (8/13/01). She indicated that those bond proceeds will be sent directly to Arbor and Arbor will then wire out payments to various vendors. I will fax you the exact total due to Woodman Design and remind you of your repeated commitment to me over the past weeks that once Arbor received money, Woodman Design Group, our client, would be paid.

*Exhibit 18.* Mr. Milone acknowledges having received the facsimile, and although he has testified that he did not reach such an agreement with Ms. Burkhardt and that he disagreed with the assertion in her facsimile that he had made "repeated" commitments to her over the past weeks that Woodman would be paid, he did not contact or write to Ms. Burkhardt to dispute her statements. *Milone Tr. at pp. 121-122.*

25.     Arbor contends that as Ms. Burkhardt was discussing Woodman's outstanding receivable with Mr. Milone, she understood that HUD was taking the position Woodman could not be paid out of the operating deficit bond is also

14

based on a selective reading of her testimony. Although Ms. Burkhardt agreed that HUD was telling her Woodman could not be paid out of the terms of the operating deficit bond, she went on to note that those discussions were fluid and subject to change.

> HUD had said repeatedly, we won't pay you because you are not an operating deficit creditor. And we had the whole discussion as to why that didn't make any sense, and that was getting *revisited and rethought, and HUD told me it was getting revisited and rethought*, and that was part of the whole effort in July and August to figure out what to do with the money.

*Burkhardt Tr. p. 124-125.*

26. HUD informed Mr. Milone that it was considering whether to pay Woodman out of the proceeds of the operating deficit bond. *Milone Tr. pp. 130-131*. HUD told Mr. Milone that the primary concern with respect to the use of the operating deficit funds was the "health, safety and welfare of the tenants because it was an assisted living facility and providing services to them and being careful to identify what those services were to have them on the operating deficit list to be paid." *Milone Tr. p. 129*.

27. Contemporaneously with his discussions with Ms. Burkhardt about the use of the operating deficit bond proceeds, Mr. Milone was informed of a facsimile from HUD to Linda Silberstein outlining the proposed uses of the operating deficit bond. Woodman was conspicuously absent from the list while Arbor was front and center, with a $387,410.47 line item for the payment of interest – more than four times the amount due to the next highest creditor on the list. *Exhibit 19*.

28. On August 14, 2001, Victor Bove of Arbor requested that HUD approve the payment of over $670,000 to Arbor out of the proceeds of the operating deficit bond. Mr. Bove provided a schedule of the amounts Arbor was requesting, including: (1) $185,935.94 in interest due as of April 30, 2001; (2) $96,426.53 for interest due for May 2001; (3) $109,561.65 for principal and interest due as of July 1, 2001; and (4) $109,561.65 for principal and interest due as of August 1, 2001. *Exhibit 20.* The interest and principal debits due to Arbor were in fact paid in August 2001 out of the proceeds of the operating deficit bond. *Milone Tr. at p. 135.*

29. Woodman filed an action against Newtown Homesteads and others in state court in Massachusetts on September 19, 2001. Defendants removed the action to the United States District Court for the District of Massachusetts on October 1, 2001. Arbor was named as a trustee process defendant in the initial complaint.

30. On October 19, 2001, the United States District Court for the District of Massachusetts (Young, J.) issued a writ of attachment commanding the attachment of up to $255,000 of the real estate and/or personal property of The Homesteads of Newtown, LLC. *Exhibit 21.*

31. Also on October 19, 2001, the Court issued a Summons to Arbor as trustee requiring Arbor to disclose under oath "what goods effects or credits" of Newtown Homesteads were in its "possession at the time of service of this summons...." *Exhibit 22.* The summons expressly noted that "[s]uch good, effects

16

or credits are hereby attached." *Id.* Arbor was served with the summons on October 22, 2001 at 1:30 p.m. *Id.*

32. As of October 22, 2001, Arbor had $333,000 in an account holding funds from the operating deficit bond. *Exhibit 23.*

33. On November 1, 2003, Arbor filed an answer to the trustee process summons stating that Arbor was not, as of the date of service of the summons, in "possession of any funds, good or credits due" Newtown Homesteads. *Exhibit 24.*

                                      Respectfully submitted,
                                      Woodman Design Group, Inc.

                                      By its attorneys,

                                      Brian E. Whiteley
                                      Federal Bar No. CT23223
                                      For Scibelli and Whiteley, LLP
                                      45 School Street, Third Floor
                                      Boston, MA 02108
                                      (617) 227-5725

                                      Marc P. Mercier
                                      Federal Bar No. ct10886
                                      For Beck and Eldergill, P/C.
                                      447 Center Street
                                      Manchester, CT 06040
                                      (860) 646-5606

Dated: November 3, 2003

## CERTIFICATE OF SERVICE

I, Brian E. Whiteley, hereby certify that I caused a true and accurate copy of the foregoing document to be served by Federal Express on

Constantinos G. Panagopoulos, Esq.
Ballard Spahr
601 13th Street, N.W., Suite 1000 South
Washington, DC 20005

And by First Class Mail on

Martin L. McCann. Esq.
Zeldes, Needle & Cooper, P.C.
1000 Lafayette Blvd.
PO Box 1740
Bridgeport, CT 06601

Patrick W. Boatman, Esq.
Boatman, Boscarino, Grasso and Twchtman
628 Hebron Avenue
Glastonbury, CT 06033

_____
Brian E. Whiteley